**Vincent E. TOWNSEND, Plaintiff,**

**v.**

**EXCHANGE INSURANCE COMPANY; Selective Insurance Company of America; and Selective Insurance Group, Inc., Defendants.**

**No. 97–CV–0866C(Sc).**

United States District Court, W.D. New York.

Feb. 9, 2002.

McGrath & Polvino, PLLC (Donald G. McGrath and Andrea R. Polvino, of counsel), Williamsville, New York, for plaintiff.

Brown Raysman Millstein Felder & Steiner LLP (Joel L. Finger, of counsel), New York City, for defendants.

## INTRODUCTION

CURTIN, District Judge.

Defendants Exchange Insurance Company, Selective Insurance Company of America, and Selective Insurance Group, Inc. (collectively, defendants) have filed a motion for partial summary judgment, Item 58, seeking dismissal of plaintiff Vincent Townsend's claims for back pay, front pay, and punitive damages under the Age Discrimination in Employment Act ("ADEA") and the New York Human Rights Law ("HRL"), as well as dismissal of his compensatory damages claims under

the ADEA. In addition, defendants seek dismissal of any claim of age discrimination that Mr. Townsend may have based on the hiring of James Chavanne as a Team Leader, a position for which Mr. Townsend had applied. Mr. Townsend has opposed defendants' motion. Items 67–69. Oral argument took place on January 4, 2001.

## BACKGROUND

In 1964, Vincent Townsend began his career in the insurance industry. Item 60, Ex. 3, ¶ 13. After holding a number of positions with different insurance companies, mainly in Central and Western New York, he was hired by Exchange Insurance Company in April 1987 as Agri Business Manager. *Id.*, ¶ 18. He was promoted to Senior Marketing Representative, and was later made Team Leader of the Lower Hudson Valley and Western New York Commercial Underwriting Teams. *Id.* In 1992, Exchange was acquired by Selective Insurance Company, and Townsend became employed by Selective. *Id.*, ¶ 21. In 1996, the Buffalo office of Selective was restructured, and the number of Underwriting Team Leader positions was reduced from three to two. Item 60, Ex. 1, pp. 1, 2. In addition, the Marketing Representative positions were eliminated and replaced with six Agency Management Specialist (AMS) positions. The employees were told to reapply for the positions they desired. Item 60, Ex. 11, p. 14. Townsend, who was 53 years old at the time, applied for one of the Team Leader positions and for two of the AMS positions. *Id.*, p. 2. He was interviewed for those positions in July 1996. Item 60, Ex. 11, pp. 291–92. Townsend became ill during

the second week of August 1996, and underwent heart surgery that same month. *Id.*, p. 307. He was out of work on paid disability leave until he returned to work on December 23, 1996. *Id.*, p. 308. Prior to his return, he was told in a telephone conversation in early December that when he came back, he would have a job. *Id.*, p. 148. Also in early December, through a conversation his wife had with one of his co-workers, Townsend learned he was not selected as a Team Leader and would return as an underwriter. *Id.*, p. 312. The company policy was explained by its Director of Human Resources: "Selective's policy was that employees who were not able to work within 12 weeks of the start of a disability were not guaranteed a return to their former or similar positions.... Selective's policy was to work with such employees to identify any openings for which they might be qualified at the time they were able to return to work." Item 60, Ex. 8, ¶ 5. By the time he returned to work, Townsend had been on disability leave for over 16 weeks.

In September 1996, the Team Leader positions were filled by Anthony Morano, age 61, and Arlene Callahan, age 46.[1] The AMS positions were also filled by others. Item 61, ¶ 8. In October 1996, Mr. Morano was removed as Team Leader. On December 5, 1996, James Chavanne, age 35, was selected to fill Morano's former Team Leader position. *Id.*, ¶¶ 9, 10.

Upon returning from disability leave on December 23, 1996, Townsend was reassigned to a Commercial Underwriter position with the same salary and benefits he had received in his former position as Team Leader.[2] Item 60, Ex. 11, p. 334.

---

[1.] During oral argument, plaintiff's counsel claimed that the decision to replace Townsend was made prior to the time he left on disability. When asked by the court where in the record evidence supporting that assertion could be found, he claimed that it was contained in plaintiff's response to defendants' motion. The court could not find any such reference.

[2.] Also, during oral argument, defendants' counsel stated that the salary of the new Team

He also filled in for an AMS in Syracuse who had resigned. He handled calls from agents regarding anything that AMS had quoted which was in the computer. *Id.,* pp. 316, 318. He was never given a reason why he had not been selected for the Team Leader and AMS positions. *Id.,* p. 318.

On January 3, 1997, Townsend told his supervisors that he wished to resign. He asked whether Selective would provide him with the displacement package that employees displaced in the restructuring had received. *Id.,* p. 322. He submitted a letter of resignation on that date. He testified that he requested the displacement package because "I didn't think it was proper that I hadn't received one of the jobs since I was more qualified than the other people." *Id.,* p. 321. On January 20, 1997, Townsend signed a separation agreement, containing the terms of his displacement package. Townsend would receive twenty weeks of pay, and his last day of work would be March 29, 1997. *Id.,* p. 329. Selective provided Townsend with one additional week of pay, without his having to work, to make his separation effective April 6, 1997. This would insure his eligibility for a pension. *Id.,* p. 330.

On June 19, 1997, Townsend swore to a charge, submitted to the Equal Employment Opportunity Commission (EEOC). Item 60, Ex. 9. He asserted:

At the time of my termination, I was a Team Leader for two underwriting teams serving the Western New York and Lower Hudson Valley regions. I was qualified for the position I held and was qualified for other positions that were created to supplant or replace the Team Leader position, including Agency Management Specialist. . . .

On or about September 1, 1996, I was effectively terminated from my position as Team Leader because of my age, in violation of the Age Discrimination in Employment Act and the New York State Executive Law.

*Id.,* p. 1.

Following its investigation, the EEOC found no reasonable cause that the ADEA had been violated. The letter, dated January 21, 1998, stated:

You alleged that you were terminated from your position as a Team Leader . . . because of your age. . . .

. . . You were not selected for the [Team Leader] position and the Respondent instead selected a 61 year-old individual and a 47 year-old-individual. You were offered and accepted a position as an Underwriter which had not [sic] reduction in salary. The facts do not support your allegation that you were terminated from your position as a Team Leader especially in light of the fact that the Respondent selected a 61 year-old to retain the position.

Item 60, Ex. 10.

On November 3, 1997, Mr. Townsend filed a complaint in federal court alleging age discrimination in employment under the ADEA and HRL, constructive discharge, compelled self-defamation, and a violation of § 510 of ERISA. Item 1. He asserted that in September 1996, he was demoted, constructively discharged, and replaced because of age discrimination while he was on disability leave. *Id.,* ¶ 18. He claimed he was "replaced as Team Leader by a younger, less experienced employee and was denied alternative employment positions solely because of his age." *Id.,* ¶ 20. In his responses to Defendants' First Set of Interrogatories, Townsend had identified only Arlene Callahan as "the

Leaders (Callahan and Morano) was the same as the Team Leader salary when Townsend occupied the position. Item 73, p. 16. However, there is no information in the motion papers that substantiates this assertion.

person alleged in paragraph 20 of the Complaint to be the 'younger, less experienced employee' who replaced Plaintiff as Team Leader...." Item 60, Ex. 6, pp. 5–6. He also noted that Morano's appointment as Team Leader was "intended to be interim in nature only while 'more important' positions were staffed as part of the corporate restructuring." *Id.,* p. 6.

Defendants filed a motion for summary judgment in April 1999, Item 14, seeking to dismiss plaintiff's complaint. On March 29, 2000, United States Magistrate Judge Hugh B. Scott issued a Report and Recommendation granting defendants' summary judgment motion on the constructive discharge, compelled self-defamation, and ERISA claims, and denying the motion on the age discrimination claims under ADEA and HRL. Item 26. The Report and Recommendation noted that "Townsend admits that he voluntarily resigned from his position as a Commercial Lines Underwriter so that he could take advantage of the displacement package offered to individuals who lost their jobs as a result of the 1996 reorganization...." Item 60, Ex. 1, p. 5. The Report and Recommendation also pointed out, with regard to the Underwriter Team Leader positions, that just a few months after the appointments of Morano and Callahan were made, "Morano was demoted and replaced by James Chavanne who was 35 years old at the time.... Despite the fact that Townsend had formerly held the Underwriter Team Leader position, it appears that he was not considered as a replacement for Morano." *Id.,* pp. 7–8. This finding suggested that the Magistrate Judge considered that the demotion of Mr. Morano and his replacement by Chavanne is part of Townsend's age discrimination claim.

On May 17, 2001, this court affirmed the findings in the Report and Recommendation. Item 37. This court then issued an Order requiring plaintiff's counsel to in-

form defense counsel whether Townsend would raise an additional claim of age discrimination based on the hiring of Chavanne, as suggested in the Report and Recommendation. Item 41. Plaintiffs counsel responded via letter that "We would, therefore, agree with the Magistrate's Report and Recommendation that the appointment of James Chavanne after Mr. Morano's extremely brief stint as Team Leader was an act of age discrimination." Item 42. Discovery was reopened, and Mr. Townsend was deposed again. During his deposition, Townsend testified that, with regard to the paragraph in his complaint wherein he asserted that he was replaced as a team leader by a "younger, less experienced employee," he was referring to both Arlene Callahan *and* James Chavanne. Item 60, Ex. 11, p. 444. Subsequently, defendants filed the instant partial summary judgment motion.

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment may be granted only when it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying [which materials] ... it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. Front Pay, Back Pay, Punitive Damages, Compensatory Damages

■ The purpose of awarding damages in employment discrimination cases is to make the victim whole. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 254, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

In his complaint, Townsend seeks "compensatory damages for lost revenue including back pay, front pay, loss of benefits, pain and suffering, mental anguish and an additional award as and for punitive damages" for defendants' alleged violations of the ADEA and HRL. Item 1, Wherefore Clause, ¶¶ 1, 2. Defendants argue that the damages claims should be dismissed because Townsend voluntarily resigned, the court found that he was not constructively discharged, and because punitive damages are not available under those statutes. Plaintiff responds that back pay is appropriate where "recognized opportunities for career advancement are closed off by reason of discrimination and because of that the individual resigns...." Item 67, p. 11. Similarly, plaintiff contends "because Mr. Townsend's resignation is not a bar to back pay, defendants' argument as regards [denial of] front pay must fail as well." *Id.* Plaintiff did not address defendants' punitive damages argument.

### A. Punitive Damages

■ First, as a matter of law, punitive damages are not available under either the ADEA or HRL. *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 147 (2d Cir.1984); *Brennan v. City of White Plains*, 67 F.Supp.2d 362, 378 (S.D.N.Y. 1999). That part of defendants' motion seeking dismissal of the punitive damages

claims under the ADEA and HRL is granted.

At oral argument, counsel for defendants clarified that although punitive damages were not available under the ADEA, liquidated damages were available. *See Paolitto v. John Brown E & C, Inc.*, 151 F.3d 60, 67 (2d Cir.1998) ("The ADEA authorizes, in the case of willful discrimination, an award of liquidated damages....").

### B. Compensatory Damages

■ The purpose of awarding compensatory damages is to " 'make good or replace the loss caused by the wrong or injury.' " *Beckford v. Irvin*, 49 F.Supp.2d 170, 184 (W.D.N.Y.1999) (quoting *McMillian v. F.D.I.C.*, 81 F.3d 1041, 1055 (11th Cir.1996)). "Compensatory damages cover out-of-pocket losses and economic injury, and remedy the pain and suffering experienced by the plaintiff." *Gilbert v. Hotline Delivery*, 2001 WL 799576 at * 3 (S.D.N.Y. July 10, 2001). However, under the ADEA[3], compensatory damages are not available for the emotional pain and suffering a plaintiff allegedly suffered as a result of the defendants' actions. *Johnson*, 731 F.2d at 147; *Rotert v. Jefferson Federal Savings & Loan Assoc.*, 623 F.Supp. 1114, 1120 (D.Conn.1985). That part of defendants' motion seeking dismissal of his compensatory damages claim under the ADEA for emotional pain and suffering is granted.

### C. Back Pay

■ "[O]ne of the fundamental purposes of the Title VII back pay provision ... is to deter discriminatory conduct and to spur employers to evaluate their employment practices." *EEOC v. Joint Ap-*

---

**3.** Defendants' motion is not addressed to Townsend's claims for compensatory damages under the Human Rights Law. Item 59, p. 4, n. 4.

*prenticeship Comm. of the Joint Indus. Bd. of the Electrical Indus.*, 164 F.3d 89, 101 (2d Cir.1998).[4] The Supreme Court has held that "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The choice of whether to award back pay is left to the equitable discretion of the district court. *Id.* at 415–16, 95 S.Ct. 2362. "The equitable remedy of back pay is designed to 'completely redress the economic injury the plaintiff has suffered as a result of discrimination' by providing compensation for lost wages, anticipated raises and fringe benefits from the date of discharge until the date of judgment." *Schlant v. Victor Belata Belting Co., Inc.,* 2000 WL 1737945 at *1 (W.D.N.Y. Nov.9, 2000), quoting *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 144–45 (2d Cir.1993). The backpay period is usually measured from the date of the termination until the date of judgment. *Id.*

**1 . Prior to December 23, 1996**

Both the *Schlant* and *Saulpaugh* courts found that if a plaintiff is disabled, the time period of the disability should be excluded from a possible award. This is because a plaintiff is entitled to losses suffered "as a result" of defendants' discrimination: since the plaintiff would not have been entitled to a salary while disabled, the losses the plaintiff suffered were not the result of discrimination. "The rule in the Second Circuit is clear—*viz.,* no back pay is available to a plaintiff during a

period of disability." *Schlant,* 2000 WL 1737945 at *1.

■ Townsend was on disability from early August until December 23, 1996. He is not eligible to receive any back pay during that period.

**2. December 23, 1996 to January 3, 1997**

■ Townsend returned from disability leave on December 23, 1996, and submitted his resignation on January 3, 1997. During this eleven-day period of time, which encompassed both the Christmas and New Year's holidays, Townsend worked as a Commercial Underwriter. He was paid the same salary and benefits he had earned as a Team Leader. Item 60, Ex. 11, p. 334. Because there was no salary differential between the Team Leader and Commercial Underwriter position, plaintiff suffered no wage loss by virtue of not being hired as team leader during this period. During oral argument, plaintiff's counsel agreed that Townsend would not be eligible for a back pay award for the December 23, 1996 – January 3, 1977 time period. Item 73, p. 16.

**3. January 3, 1997 – April 6, 1997**

■ Although Townsend submitted his resignation on January 3, 1997, the separation agreement he signed on January 20, 1997 provided that his last day of work would be March 29, 1997. Item 60, Ex. 8, ¶ 4. Selective then gave him "an additional week of pay (without his working) to make his separation effective April 6, 1997, in order to ensure his eligibility for early retirement benefits." *Id.* Therefore, during this time period, Townsend was being paid at the same rate as a Team Leader. The analysis as to whether he would be

---

**4.** The standards governing damages in a case brought under the ADEA are the same as those for a Title VII case. *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983).

eligible for back pay is no different from the December 23, 1996 – January 3, 1997 time period, reviewed *supra.* Townsend is not eligible for back pay during this time.

### 4. April 7, 1997 Onward

Counsel have argued quite vociferously as to whether Townsend may be entitled to back pay from January 3, 1997 onward, as a matter of law. Most cases view the date of resignation as the date from which back pay is computed, principally because the employee leaves on the date of resignation. In this case, Townsend worked and was paid for twelve additional weeks following his official resignation, and was paid for another week that he did not work. Thus, the court considers the relevant time frame as to whether he was eligible for back pay from the date of April 7, 1997 onward.

Defendants point to decisions from other circuits which hold that if an employee is not constructively discharged and resigns voluntarily, that employee may not receive back pay from the date of resignation. *See* Item 59, p. 5. Plaintiff cites other cases which follow other rationales and conclude that a court may provide back pay to a plaintiff who resigns. *See* Item 67, pp. 9–11.

In his complaint, Townsend claimed he was "constructively discharged and demoted" from his Team Leader position "to a staff underwriting position in September 1996 while on disability leave." Item 60, Ex. 3, ¶ 18. However, the Report and Recommendation, adopted by this court, denied Townsend's constructive discharge claim, stating "defendants are correct in noting that the plaintiff has failed to establish the elements of constructive discharge." Item 60, Ex. 1, p. 6 & n. 5. The Report and Recommendation noted that Townsend voluntarily resigned his position in order to take advantage of the company's displacement package. *Id.,* p. 5.

A number of circuits have held that "in order for an employee to recover back pay for lost wages beyond the date of his retirement or resignation, the evidence must establish that the employer constructively discharged the employee." *Jurgens v. EEOC,* 903 F.2d 386, 389 (5th Cir.1990). *See Maney v. Brinkley Municipal Waterworks & Sewer Dept.,* 802 F.2d 1073, 1075 (8th Cir.1986); *Derr v. Gulf Oil Corp.* 796 F.2d 340, 342 (10th Cir.1986). As defendants point out, although the Second Circuit has not addressed the issue, this court has in *Less v. Nestle Co., Inc.,* 705 F.Supp. 110 (W.D.N.Y.1988). In *Less,* this court found that the plaintiff was not constructively discharged, but rather voluntarily chose to retire early and accept a retirement incentive. As a consequence, the plaintiff was "precluded from claiming damages accruing from the date of his voluntary resignation." *Id.* at 114. In *Rotert v. Jefferson Federal Savings & Loan Assn.,* 623 F.Supp. 1114 (D.Conn. 1985), the plaintiff asserted claims for constructive discharge and discriminatory transfer. The court cited the rule in *Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61 (5th Cir.1980) that plaintiff could not recover damages for the period following voluntary resignation if he was not constructively discharged. However, the facts in both *Less* and *Rotert* are different from those in this case. *Less* was a promotion case and, further, Mr. Less retired. In *Rotert,* the plaintiff was assigned to another job with different duties, which makes it different from this case in which Townsend had to reapply for the same job.

Most of the cases cited above, where back pay has been disallowed, involve promotions. Finding no constructive discharge, courts explain their reasoning for denying back pay for employees denied

promotion as follows: "Title VII itself accords legal protection to employees who oppose unlawful discrimination.... [W]e believe that society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships." *Bourque,* 617 F.2d at 66.

This otherwise straightforward rule would likely resolve the issue of whether plaintiff was eligible for back pay following April 7, 1997 if not for a number of other cases which offer the court different rationales for arriving at the opposite conclusion.

Plaintiff cites *Thorne v. City of El Segundo,* 802 F.2d 1131 (9th Cir.1986); and *Nobler v. Beth Israel Medical Center,* 715 F.Supp. 570 (S.D.N.Y.1989), which, in various ways, distinguish the line of cases relied upon by defendants. Plaintiff argues that *Thorne* and *Nobler* support his theory that where the "recognized opportunities for career advancement are closed off by reason of discrimination and because of that the individual resigns, back pay restrictions, such as those the defendants urge here, are inapplicable." Item 67, p. 11. Plaintiff also distinguishes *Less. Id.*

In *Thorne,* the Ninth Circuit affirmed a district court's holding that an employee who voluntarily resigned, and who was not constructively discharged, was still eligible for back pay. The plaintiff in *Thorne* worked as a clerk-typist for a police department and sought a position as a police officer. Despite her high performance on oral and written tests and on the physical agility exam, the department disqualified her from consideration. She voluntarily quit her position as clerk-typist four months later. The *Thorne* court cited a number of reasons why it would not follow the various precedents which prohibit an employee from collecting back pay beyond the employee's voluntary resignation, un-

less the employee demonstrates constructive discharge. It differentiated promotion/demotion cases, which apply the constructive discharge doctrine, from the case before it which involved refusal to hire. The *Thorne* court noted that the plaintiff was preparing to enter an entirely different career. Thus, the *Bourque* philosophy urging plaintiffs to stay and fight discrimination from within was inapplicable; remaining as a clerk typist would not put the plaintiff in a better position to attack discrimination in police officer hiring than anyone else.

*Thorne* also cited *Sangster v. United Air Lines,* 438 F.Supp. 1221 (N.D.Cal. 1977), *aff'd,* 633 F.2d 864 (9th Cir.1980), which articulated an entirely different rationale than *Bourque* concerning availability of back pay following a voluntary resignation. In *Sangster,* a stewardess supervisor sought a job as stewardess which she once had when she was unmarried. The Airline refused to give her the stewardess job, and she quit. In attempting to fashion a remedy, the court opined:

> If relief is to be limited in any significant measure in all instances where an employee quits one job after unlawfully being denied another job by the same employer, then the employee would be constrained either to contribute by his labor to an employer who has treated him unfairly and who persists in that unfair treatment, or to take less than a whole remedy for injuries suffered. Again, to reduce a remedy unless the employee consents to serve his employer during the nine years it may take, as here, to obtain that remedy, would force impossibly onerous choices on the employee and, because the employee's readiness to bring charges would be inhibited, the Act's purpose of ending eco-

nomic discrimination would be frustrated.

*Id.* at 1230.

In addition, *Thorne* cited a number of promotion cases where courts did not apply the back pay limitation rule, despite the fact that the employee had not been constructively discharged. 802 F.2d at 1136 & n. 4. It is not as unequivocal a rule as defendants in this case would wish it to be.

The *Sangster* alternative rationale was followed by Judge Sweet in *Nobler v. Beth Israel Medical Center*, 715 F.Supp. 570 (S.D.N.Y.1989), although for slightly different reasons and applied to slightly different facts. *Nobler* involved a promotions case where plaintiff was seeking the position of Director of Radiation Therapy at a medical center. He learned that he was not chosen and resigned one month before the new director assumed the post. Plaintiff found a position at another medical center, and did not suffer a decrease in salary. On summary judgment, the defendant attacked plaintiff's request for, *inter alia*, back pay, citing *Bourque*. However, the court distinguished the reasoning in *Bourque* by noting that there was only one position that the plaintiff had sought. It was filled by someone else, and there was "no purpose to be served by Nobler staying at BIMC to try to work out the dispute within the context of the employment relationship, for amelioration was unavailable." *Id.* at 572. While observing that an employee "faced with an obstacle in the local progression and development of a career should not quit at the first sign of institu-

tional discrimination," the court found that the plaintiff had no opportunity to overcome such resistance. *Id.* Thus, the back pay restrictions were inapplicable. *Nobler*, as well, cited cases where back pay may be available, especially where a plaintiff claims that he resigned as a result of the alleged discrimination. *Id.* at 573.

It appears that the *Bourque* and *Sangster* decisions reflect the philosophical split amongst various courts in how they interpret *Albemarle's* invocation to "deny backpay only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle*, 422 U.S. at 421, 95 S.Ct. 2362.

On the facts, the case at bar does not bring it squarely within the orbit of either *Bourque* or *Sangster*. It is not a promotion case, fitting within that precedent, but more like a refusal to rehire or termination case. It is not exactly a rehiring for a totally different job, as in *Thorne*. Townsend could have attempted to stay within the ranks and fight discrimination. However, Townsend squarely confronted an obstacle in the career progression of his job. Simply because there were two team leader positions, not one, does not make the uniqueness rationale, articulated in *Nobler*, inapplicable [5].

For these reasons, the motion of defendant to strike plaintiff's claim for back pay for April 7, 1997 onward is denied.

---

**5.** Townsend claims that he was terminated on the ground that he was not qualified for the Team Leader position, the position he had held, or any alternative position at Selective. The only alternative position available was the AMS position. Although there was an AMS position available when he returned to work on December 23, 1996, he did not apply for it.

Further, he does not argue in his papers that he should be eligible for back pay for the AMS position. The focus of his argument is that he should receive back pay for the Team Leader position. Therefore, the Nobler/Sangster rationale does not protect Townsend's claim for back pay concerning the AMS position.

### D. Front Pay

The decision to award the equitable remedy of front pay lies within the discretion of the court. *Greenbaum v. Svenska Handelsbanken, NY,* 979 F.Supp. 973, 987 (S.D.N.Y.1997). "An award of front pay is made when reinstatement is neither possible nor practicable and the undisabled plaintiff has no 'reasonable prospect of obtaining comparable alternate employment.'" *Schlant,* 2000 WL 1737945 at *3, quoting *Bonura v. Chase Manhattan Bank, N.A.,* 629 F.Supp. 353, 362 (S.D.N.Y.1986). In such situations, the district court is empowered to award "a reasonable monetary award of front pay" that is, an award of "future lost earnings." *Banks v. Travelers Companies,* 180 F.3d 358, 364 (2d Cir.1999) (citations omitted).

Defendants, citing *Less* and *Rotert,* argue that Townsend is not entitled to front pay because of the court's rejection of his constructive discharge claim. Because it is not possible to determine, on the record presently before the court, whether Townsend had a reasonable prospect of obtaining reinstatement or comparable alternate employment, defendants' motion to deny front pay is denied, with leave to renew at a later time.

### III. The Chavanne Claim

In his complaint, Townsend alleged that the defendants' failure to hire him as a Team Leader in September 1996 represented an instance of discrimination against him. Four years later, Townsend asserted a claim that the hiring of James Chavanne as Team Leader in December 1996, following Morano's "extremely brief stint" in that position, represented another instance of Selective's discrimination against Townsend on the basis of age. Item 60, Ex. 5. Defendants assert that this claim "should be barred by (1) the applicable periods of limitations of the ADEA and the Human Rights Law; (2) [Townsend's]

failure to state a *prima facie* claim because he was out on disability leave when Mr. Chavanne was selected to replace Mr. Morano; and (3) his deposition admissions that he had no facts on which to base such a claim." Item 59, p. 8.

Townsend responds that the EEOC *did* have notice of his discrimination claim based on the hiring of Chavanne to replace Morano. Item 67, p. 3. Townsend asserts that if the EEOC had wished to make a thorough investigation of the claim, "such an investigation would have revealed the facts upon which defendants now seek this dispositive relief." *Id.,* p. 4. He contends that his claim was "reasonably related" to the claim set forth in the charge letter to the EEOC and thus survives. *Id.,* pp. 4–5. Plaintiff also asserts that the claim survives under the "single filing" rule, and because defendants waived their right to assert a claim of failure to exhaust administrative remedies. *Id.,* pp. 6–7. In addition, Townsend maintains that he has stated a *prima facie* case of discrimination on this claim. *Id.,* p. 8.

It must first be pointed out that the Chavanne claim was not mentioned in Townsend's complaint. Judge Scott was the first to ruminate about the possibility of this claim in his Report and Recommendation, and plaintiff asserted the claim only after this court inquired about it, four years after the original complaint was filed. No amended complaint was filed.

In his charge to the EEOC, Townsend claimed he was terminated from his Team Leader position on or about September 1, 1996. Item 60, Ex. 9. The charge did not mention any termination or position filled subsequent to that date, in general, or the replacement of Morano by Chavanne, specifically. The charge did not assert any ongoing acts of alleged discrimination beyond his claimed September 1, 1996 termination date. Neither was the charge

amended to reflect any of these additional claims. The EEOC's investigation and findings solely covered allegations of discrimination related to the Team Leader positions filled by Morano and Callahan in September 1996. Item 60, Ex. 10.

■ "A district court may only hear those claims that either are included in an EEO charge or are based on conduct subsequent to the EEO charge which is 'reasonably related' to that alleged in the EEO charge." *Neratko v. Frank,* 31 F.Supp.2d 270, 279 (W.D.N.Y.1998) (citations omitted). Because Townsend's claim regarding the hiring of Chavanne was not included in the EEO charge, a court may entertain the claim only if it is "reasonably related" to the original charge. This requirement

> is designed to give the administrative agency the opportunity to investigate, mediate, and take remedial action to encourage the settlement of discrimination disputes through conciliation and voluntary compliance. If a complainant could litigate a claim not previously presented to and investigated by the EEO, then the exhaustion element of [ADEA's] statutory scheme could easily be circumvented.

*Id.* (citations omitted).

The question thus becomes: would Townsend's new claim of discrimination concerning the hiring of Chavanne in December 1996, as a replacement for Morano, be reasonably related to his discrimination claim concerning his own September 1, 1996 termination?

The Second Circuit has recognized three kinds of situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge such that they could be asserted:

> (1) where the conduct complained of would fall within the scope of the EEO investigation which could be reasonably expected to grow out of the charge of

discrimination; (2) where the plaintiff alleges retaliation by the employer for filing the EEO charge; and (3) where the complaint alleges further incidents of discrimination carried out in precisely the manner alleged in the EEO charge.

*Neratko,* 31 F.Supp.2d at 279, citing *Spurlock v. NYNEX,* 949 F.Supp. 1022, 1027 (W.D.N.Y.1996); and *Butts v. City of New York Dep't of Housing,* 990 F.2d 1397, 1402 (2d Cir.1993).

■ Townsend asserts that the third rationale applies here. Item 67, p. 4. He argues that his charge letter was the fourth discrimination claim to be filed against the same companies within a period of eight months, and that defendants cannot claim surprise regarding Townsend's discrimination claims regarding Chavanne since the claim was raised in the Magistrate Judge's Report and Recommendation and in a May 1998 interrogatory. Item 67, p. 5.

These arguments are beside the point, since Townsend's complaint did not allege further incidents of discrimination carried out in precisely the manner alleged in the EEO charge; and notice to the *EEOC,* not notice to the *defendants,* provides a basis for determining whether a reasonable relationship applies. Given the narrow scope of the EEOC charge related to the September 1, 1996 termination, this court is not convinced that the alleged subsequent act of discrimination can be said to have been "carried out in precisely the same manner alleged in the EEOC charge." *Samimy v. Cornell Univ.,* 961 F.Supp. 489, 493 (W.D.N.Y.1997), *quoting Butts,* 990 F.2d at 1403. The incidents were different: the September allegation specifically concerned Townsend's not being chosen for the Team Leader position. The December allegation is much more attenuated and does not directly involve Townsend. The replacement of Morano by Chavanne

occurred while Townsend was on disability leave. He could not have filled the Team Leader job even if he had reapplied. The EEOC could not be expected to independently uncover facts showing that defendants discriminated against plaintiff three months after plaintiff indicated the discriminatory act occurred, involving a replacement that did not include the plaintiff. The September and December hirings cannot be said to be related for purposes of complying with the EEOC filing requirement.

Furthermore, as defendants correctly pointed out, both in their papers, Item 72, p. 9, and at oral argument, a "reasonably related" claim applies only to alleged discriminatory conduct that occurred after the EEOC charge is filed. In this case, Townsend is arguing that the conduct, which occurred *before* he filed the EEOC charge, is reasonably related to the claim set forth in the EEOC charge. It was his duty to include all relevant alleged discriminatory conduct when he filed the EEOC charge. The rational relationship theory is not available to plaintiff. In addition, plaintiffs' "single filing" and waiver arguments do not apply either.

Because this court has no jurisdiction to consider Townsend's new claim of discrimination under the ADEA, it declines to address the merits of the claim, and grants defendants' motion to dismiss an ADEA claim by Mr. Townsend based on the hiring of Mr. Chavanne.

The court also finds that Townsend may not assert the claim based upon the hiring of Chavanne under the HRL. The statute of limitations under the HRL is three years. *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 307, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). In order to have asserted a claim that Chavanne's replacement of Morano in December 1996 was an act of age discrimination under the HRL, such a claim would have had to have been filed by December 1999. Because that claim was not filed within the statutory period, it is time-barred.

## CONCLUSION

Based on the foregoing, the court grants defendants' motion, Item 58, dismissing plaintiff's claims for damages for pain and suffering, mental anguish, emotional distress, humiliation, and loss of self-worth under the ADEA; grants defendants' motion dismissing plaintiff's claims for punitive damages under the ADEA and HRL; grants defendants' motion dismissing plaintiff's claims for back pay for the period of August 1996 to December 23, 1996, while Townsend was out on disability. He has no back pay claim for the periods of December 23, 1996 to January 3, 1997, and from January 3, 1997 to March 29, 1997, when he returned to work. Further, it is obvious he has no claim for the period March 29, 1997 to April 6, 1997 when he was paid by Selective, although he was not working. The court does not, however, dismiss plaintiff's claims for back pay from April 7, 1997 onward. Further, defendants' motion to dismiss plaintiff's claims for front pay is denied, with leave to renew. Defendants' motion dismissing the claim of age discrimination against Townsend under the ADEA and HRL regarding the replacement of Morano by Chavanne is granted.

So ordered.